UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | |
|---|---|
| BRIDGETTE SCOTT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 2:19-cv-00053-SNLJ |
| | ) |
| ANDREW M. SAUL, | ) |
| Commissioner of the Social Security | ) |
| Administration, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM AND ORDER**

The Commissioner of the Social Security Administration denied plaintiff Bridgette Scott's applications for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401, *et seq*. Scott now seeks judicial review. The Commissioner opposes the motion. The issues being fully briefed, and for the reasons set forth, this Court will **AFFIRM** the Commissioner's decision.

**I.      Procedural History**

Scott's application was denied at the initial determination level.  She then appeared before an Administrative Law Judge ("ALJ").  The ALJ found Scott is not disabled because her symptoms were not supported by the medical evidence available. Scott then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration, which was denied.  Thus, the decision of the ALJ stands as the final decision of the Commissioner.  *See* 20 C.F.R. § 404.981.  Scott now seeks review by this Court pursuant to 42 U.S.C. § 405(g).

## II.     Disability Determination—The Five-Step Framework

A disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).  A claimant has a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" *Id.* § 423(d)(2)(A).

The Commissioner follows a five-step sequential process when evaluating whether the claimant has a disability.  20 C.F.R. § 404.1520(a)(1).  First, the Commissioner considers the claimant's work activity.  If the claimant is engaged in substantial gainful activity, the claimant is not disabled.  20 C.F.R. § 404.1520(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see whether "the claimant has a severe impairment [that] significantly limits [the] claimant's physical or mental ability to do basic work activities." *Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010); *see also* 20 C.F.R. § 404.1520(a)(4)(ii).  "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *see also* 20 C.F.R. §§ 404.1520(c), 404.1520a(d).

Third, if the claimant has a severe impairment, the Commissioner considers the impairment's medical severity.  If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, the claimant is considered disabled, regardless of age, education, and work experience.  20 C.F.R. §§ 404.1520(a)(4)(iii), (d).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, the Commissioner assesses whether the claimant retains the "residual functional capacity" (RFC) to perform his or her past relevant work.  20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1545(a)(5)(i). An RFC is "defined as what the claimant can still do despite his or her physical or mental limitations." *Gann v. Berryhill*, 864 F.3d 947, 951 (8th Cir. 2017); *see also* 20 C.F.R. § 404.1545(a)(1). While an RFC must be based "on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations," an RFC is nonetheless an "administrative assessment"—not a medical assessment—and therefore "it is the responsibility of the ALJ, not a physician, to determine a claimant's RFC." *Boyd v. Colvin*, 831F.3d 1015, 1020 (8th Cir. 2016). Thus, "there is no requirement that an RFC finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016).  Ultimately, the claimant is responsible for *providing* evidence relating to his RFC and the Commissioner is responsible for *developing* the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources."  20 C.F.R.

3

§ 404.1545(a)(3).  If, upon the findings of the ALJ, it is determined the claimant retains the RFC to perform past relevant work, he or she is not disabled.  20 C.F.R. § 404.1520(a)(4)(iv).

Fifth, if the claimant's RFC does not allow the claimant to perform past relevant work, the burden of production to show the claimant maintains the RFC to perform work that exists in significant numbers in the national economy shifts to the Commissioner. *See Brock v. Astrue*, 574 F.3d 1062, 1064 (8th Cir. 2012); 20 C.F.R. § 404.1520(a)(4)(v). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, the Commissioner finds the claimant not disabled.  20 C.F.R. § 404.1520(a)(4)(v).  If the claimant cannot make an adjustment to other work, the Commissioner finds the claimant disabled.  *Id.*  At Step Five, even though the *burden of production* shifts to the Commissioner, the *burden of persuasion* to prove disability remains on the claimant. *Hensley*, 829 F.3d at 932.

### III.    The ALJ's Decision

At Step One, the ALJ found Scott met the insured status requirements through December 31, 2020, and had not engaged in substantial gainful activity since June 14, 2016. (Tr. 12). At Step Two, the ALJ found Scott suffers from three medically determinable impairments: (1) degenerative disc disease status post-surgical cervical fusion with post laminectomy syndrome; (2) osteoarthritis; and (3) obesity. (Tr. 12). At Step Three, the ALJ concluded Scott does not have an impairment or combination of impairments that meets or equals one of the presumptively disabling impairments listed in the regulations. (Tr. 15-16).

4

Next, in beginning the analysis of Step Four, the ALJ determined Scott's RFC.[1]
The ALJ found that

> [t]he claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except for the following non-exertional limitations that reduce the claimant's capacity for sedentary work: can never climb ladders, ropes, or scaffolds; can no more than occasionally climb ramps or stairs; can no more than occasionally balance, stoop, kneel, crouch, or crawl; must avoid concentrated exposure to extreme cold or excessive vibration; must avoid all exposure to workplace hazards, such as dangerous moving machinery and unprotected heights; and can no more than frequently handle or finger.

(Tr. 16). As part of this determination, the ALJ found Scott's allegations about her physical symptoms' intensity, persistence, and limiting effects were not consistent with the medical records when considered as a whole. (Tr. 17). The ALJ recognized Scott's allegedly disabling symptoms began after experiencing a vehicular accident on June 13, 2016, in which Scott later had reparative surgery to her neck. (Tr. 16). Scott says she still suffers post-operative back pain, arm numbness, and notes that she has "leg drag." But, the ALJ contrasted these symptoms with a "pattern of treatment" and "diagnostic imaging" that suggests Scott does not have "functional deficits beyond sedentary effort." (Tr. 16-17). The ALJ specifically noted some skepticism about Scott's functional abilities; for example, at one point she apparently could not make a fist despite, minutes before, being seen by providers "picking up a pencil using all fingers" and "hold[ing] her hands closed in her lap."(Tr. 17). The ALJ further noted "[a] lack of an objective medical

---

[1] Determining claimant's RFC is "essential to properly completing steps four and five." *Swink v. Saul*, 931 F.3d 765, 769 (8th Cir. 2019). However, the RFC is determined at step four—a point in which the burden of proof rests with claimant. *See Scott v. Berryhill*, 855 F.3d 853, 855 (8th Cir. 2017); *Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005).

basis that supports the degree of severity of subjective complaints alleged [by Scott]." (Tr. 18). A series of objective testing—MRIs, X-rays, and electromyography studies—showed mild, minor, or otherwise normal results. (Tr. 18). All in all, the ALJ concluded Scott "has back and neck pain with some supportive diagnostic testing," but not to the degree she otherwise urges. (Tr. 18).

Having made an RFC determination, the ALJ continued on through Step Four to determine whether Scott could perform her past relevant work in light of her designated RFC. The ALJ determined Scott is unable to perform any past relevant work. (Tr. 20).

At Step Five, the ALJ analyzed whether Scott can successfully adjust to other work. The ALJ noted that if Scott could perform all or substantially all of the exertional demands at a given level under the Medical-Vocational Guidelines (the "Grids"), 20 C.F.R. Part 404, Subpart P, Appendix 2, then the Grids would direct a conclusion of whether Scott was "disabled" or "not disabled." The ALJ acknowledged, however, that additional limitations impede Scott's ability to perform work at all or substantially all of the assigned level.  Thus, the ALJ relied on vocational expert (VE) testimony to determine the extent to which these limitations erode Scott's occupational base to perform sedentary work. The VE testified Scott could perform work as an address clerk, document preparer, and circuit board assembler even after considering all of the limitations in Scott's RFC. (Tr. 21).  The ALJ then found these jobs exist in significant numbers in the national economy and concluded Scott is not disabled. (Tr. 21).

6

**IV.     Standard of Review**

The Court must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019). "[T]he threshold for such evidentiary sufficiency is not high." *Id*. Under this test, the court "consider[s] all evidence in the record, whether it supports or detracts from the ALJ's decision." *Reece v. Colvin*, 834 F.3d 904, 908 (8th Cir. 2016). The court "do[es] not reweigh the evidence presented to the ALJ" and will "defer to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence." *Id*. The ALJ will not be "reverse[d] merely because substantial evidence also exists in the record that would have supported a contrary outcome, or because [the court] would have decided the case differently." *KKC ex rel. Stoner v. Colvin*, 818 F.3d 364, 370 (8th Cir. 2016).

**V.      Discussion**

Scott makes three challenges to the ALJ's decision. First, she says the ALJ failed at Step Three in determining she does not suffer from a spinal disorder under the criteria of Listing 1.04. Second, she says the ALJ erred in discounting her subjective complaints. Third, she says the ALJ erred in assigning too great of weight to the opinions of a state agency consultative expert. Each argument is addressed below.

7

**A. The ALJ Did not Err in Determining Scott's Impairments Failed to Meet Listing 1.04.**

Listing 1.04 is for "[d]isorders of the spine"—including herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, and vertebral fracture—"resulting in compromise of a nerve root … or the spinal cord." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 1.04. This compromise of the nerve root or spinal cord must be combined "with" one of three evidentiary components: (A) "***evidence of*** nerve root compression … ***accompanied by*** sensory or reflex loss," and "if there is involvement of the lower back, positive straight-leg raising test"; (B) "spinal arachnoiditis" that is "***confirmed by*** an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging"; or (C) "lumbar spinal stenosis resulting in pseudoclaudication" that is "***established by*** findings on appropriate medically acceptable imaging." *Id*. at § 1.04(A), (B), (C) (emphasis added).

The ALJ stated Scott's degenerative disc disease "does not meet or medically equal the criteria of Listing 1.04" because

> The medical evidence of record does not demonstrate that the claimant has a compromisation of a nerve root or the spinal cord, nerve root compression accompanied by sensory or reflex loss, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication.

(Tr. 16). Scott takes issue with the fact that the ALJ suggested she does not have "a compromisation of a nerve root or the spinal cord." Scott points to a handful of records diagnosing her with spinal stenosis, radiculopathy, and myelopathy, as well as showing "drop foot on the left," and says the "ALJ was clearly incorrect in stating [Scott] does not suffer from injury to the nerve root or spinal cord." (Tr. 509, 518). Scott's critique is

8

misleading. The ALJ did not outright say, full stop, that Scott suffers no compromise of the nerve root or spinal cord. Rather, what the ALJ said—perhaps ineloquently—is that there is no such compromise in conjunction with "nerve root compression accompanied by sensory or reflex loss, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication." In other words, Scott's nerve root or spinal cord injury did not satisfy subsections A, B, or C of Listing 1.04.

      The purpose of subsections A, B, and C is to provide evidentiary confirmation of a nerve root or spinal cord compromise—indeed, presumptively disabling spinal injuries are not determined in a vacuum accordingly solely to subjective diagnoses. *See, e.g., Brown v. Astrue*, 789 F.Supp.2d 470, 483 (D. Del. 2011) (rejecting claimant's Listing 1.04 arguments that emphasized a doctor's "opinion that plaintiff suffers from chronic left C6 radiculopathy" but that was not, thereafter, confirmed by MRI that found "no cord impression or compression"). This is made clear in the introductory paragraphs preceding Listing 1.04. Those paragraphs, contained in Section 1.00, note that "musculoskeletal impairments should be supported [] by … laboratory findings, including findings on x-ray or other appropriate medically acceptable imaging." In other words, objective findings are "used" to support an "evaluation [or] diagnosis of [a spinal] impairment" 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 1.00(C). Objective testing is necessary to combat skepticism appropriately levied against physical evaluations and the diagnoses made from those evaluations. Noting their possible unreliability, it is explained that "physical findings" should not act as a mere "report of the individual's allegations," rather such findings "must be determined on the basis of objective observation" and, even then,

9

supported "over a period of time" through "detailed descriptions of the rheumatological, orthopedic, neurological, and other findings." *Id*. Thus, as an example, in reference to Listing 1.04(B) it is emphasized that "the cause of spinal arachnoiditis is not always clear," thus a "[d]iagnosis ***must be confirmed*** at the time of surgery by gross description, microscopic examination of biopsied tissue, or by findings on appropriate medically acceptable imaging." *Id*. at §1.00(K)(2). All this is to say, Listing 1.04 cannot be satisfied on rote, summary diagnostic recitals alone—guesswork in themselves. In a typical record comprising hundreds of pages of records, it is not surprising to find that the average claimant can probably find at least one tangential reference to some diagnosis supporting one of the presumptively disabling listings. But the task at hand is to meet a specific listing as it is narrowly specified and, in this case, Scott does little to show she met any of the components of Listing 1.04 (A), (B), or (C).

Indeed, Scott argues in highly conclusory fashion that her "stenosis, radiculitis, and myelopathy cause nerve root compression" in that she has "limitation of motion" and "drop foot on the left." She also points out that she "had a finding of positive straight leg raising on May 24, 2018." These arguments appear focused on Listing 1.04(A). But, again, while a diagnosis "should be supported [] by detailed descriptions" of such things as "range of motion" and "sensory or reflect changes," that alone is not enough; the diagnosis and associated symptomology should also be supported and confirmed by "findings on x-ray or other appropriate medically acceptable imaging" including CAT scans, MRIs, myelography, and radionuclear bone scans. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 1.00(C); *see also Beall v. Colvin*, 2017 WL 1155809 at *4 (N.D.N.Y. Mar. 25,

10

2017) (substantial evidence supported ALJ's determination that claimant did not suffer impairment under Listing 1.04(A) where, despite suffering pain and tenderness and diminished range of motion, MRI showed no nerve root compression and sensory exams were normal). No such corroborating evidence exists. To the contrary, Scott points to various records between April and June of 2018—summarily diagnosing her with spinal disorders, finding that she has left "drop foot," and indicating a positive straight leg test—but all of these are contradicted by other records (or, as will be seen, taken out of context) and many of them seem to merely report the allegations of Scott herself, which is prohibited by Section 1.00(D). (Tr. 458-459, 509-518).

In fact, the objective evidence does not support Scott. Reparative surgery was performed in August, 2016, to correct "herniations with severe stenosis and myelopathy" through a "C5-C6 and C6-C7 anterior cervical discectomy and fusion with fibular allograft spacers, anterior plate, and screws." (Tr. 426). One month later, an MRI found "normal alignment of the cervical spine" with "mild stenosis at C5-6" and "mild myelomalacia." (Tr. 383). By December 2016, Scott's gait and coordination had "gotten dramatically better," though "maximal improvement" would not be expected for another 12-to-18 months. (Tr. 408-409). In April 2017, another MRI found "mild narrowing" at C3-C4 and C4-C5 with "no evidence for a nerve root compression at any level" and "no compression of the cord at any level." In fact, "narrowing of the canal at C5 seen [in the 2016] MRI [had] improved." (TR. 430). In June 2017, an electromyography study concluded nerve conduction in Scott's arms were "at the upper limits of normal." (Tr. 436). In February 2018, Scott apparently slipped on ice and injured her left leg,

11

"sustaining a nondisplaced fibula fracture" and a "significant meniscal tear." (Tr. 419, 510). Postoperative diagnoses concluded Scott suffered a "left medial root tear" and a "partial ACL tear." (Tr. 422). Both might otherwise explain Scott's left "drop foot." Indeed, this happened only one month after surgery on Scott's knee—a point noted by Scott's doctor who first indicated "drop foot" in April 2018.  (Tr. 510-511). One doctor, in particular, noted Scott was "placed in a walking boot" following her fall and CT scans corroborated that she had a "significant [] lateral malleolus chip as well as ligament damage/strain." (Tr. 497). But, by May 2018, Scott was described as having a "full range of motion," with "no clubbing [and] no cyanosis" and a "steady gait." (Tr. 503). And, prior to Scott's knee injury, she was similarly noted to have "denied any complaints," including to her joints, neck, and back. (Tr. 490-491).

All in all, there is much evidence in the total record to contradict the narrow evidence favored by Scott. A single instance of a positive straight-leg test, which fails to indicate whether it was performed in both the seated and supine position as required by Listing 1.04(A), is insufficient. *See Watson v. Colvin*, 2016 WL 7840709 at *6 (M.D. La. Dec. 22, 2016) (compiling cases). The same goes for isolated instances of "drop foot." Section 1.00 embraces the notion that "musculoskeletal impairments frequently improve with time or respond to treatment," and therefore the ALJ must generally consult "a longitudinal clinical record" to assess the severity and duration of an impairment unless "the claim can be decided favorably on the basis of the current evidence." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 1.00(H). The most current evidence is notably skewed by the fact that Scott suffered an injury to her knee at the tail end of her medical records period,

12

and much of that evidence is notably terse or outright conclusory—the opposite of what Section 1.00 (C) and (E) call for. (Tr. 509-518). But, the longitudinal record, both before and after that knee injury, shows a remarkable improvement to Scott's symptoms following reparative surgery and treatment. At minimum, there is no objective evidence (i.e. evidence not reliant on Scott's own allegations) demonstrating sustained "nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, [and] motor loss … accompanied by sensory or reflex loss and … positive straight-leg raising rest (sitting and supine)." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 1.04(A); *see also Cline v. Colvin*, 771 F.3d 1098, 1104 (8th Cir. 2014) (ALJ may give less weight to physician opinions that are disproportionately based on claimant's subjective complaints rather than objective medical evidence). To the contrary, available MRI findings show exactly the opposite: "no evidence for a nerve root compression at any level" and "no compression of the cord at any level." (Tr. 430). And some of Scott's latest records, following a 12-to-18 month period described by Scott's doctors as being needed for "maximal improvement," indicate Scott had no complaints (including for joint, neck, and back pain) and a "full range of motion" with "steady gait."  (Tr. 408-409, 490-491, 503). Accordingly, this Court cannot say the ALJ erred in deciding, upon the total record, that Scott's impairments failed to meet the criteria specified in Listing 1.04(A). *See Vossen v. Astrue,* 612 F.3d 1011, 1015 (8th Cir. 2010) (substantial evidence supported ALJ's decision rejecting claimant's argument that impairments met Listing 1.04A where, despite claimant pointing to "records showing nerve root compression," the total record exhibited contrary evidence such as an MRI showing "no cord or nerve root

13

impingement" and a neurological examination showing "normal" results); *Troupe v. Berryhill*, 2017 WL 4038146 at *4 (E.D. Mo. Sept. 13, 2017) (substantial evidence supported ALJ's determination that claimant's impairment did not meet Listing 1.04A where records on treatment success, severity, and duration did not favor such a finding).

### B. The ALJ Did Not Err in Discounting Scott's Subjective Complaints

The ALJ discounted Scott's subjective complaints because of an inconsistent record that comprised a successful reparative surgery, "routine or conservative" treatment thereafter, a lack of "escalating treatment modalities," numerous daily activities that Scott could still perform (albeit with difficulty), and "minimal objective evidence" otherwise supporting disability. Scott says "[t]he ALJ's statement [about] 'minimal objective evidence' is truly astounding in this case" because of "numerous findings of radiculitis, stenosis, and myelopathy."

This argument essentially retreads the same ground as already discussed in Section A, above. Whatever Scott believes to the contrary, there is little corroborative *objective* evidence—MRIs, X-rays, and electromyography studies were all unremarkable. Again, summary diagnoses found in treatment notes—particularly when viewed in isolation— are little more than one man's opinion and not enough to support disability alone; objective data is generally critical to corroborating a diagnosis. *See, e.g., Cline v. Colvin*, 771 F.3d 1098, 1103-1104 (8th Cir. 2014) (ALJ correctly rejected provider's diagnosis and associated functional limitations that "did not contain citations to medical tests or diagnostic data" and seemed, instead, to directly contradict recent MRIs); *Janka v. Secretary of Health, Ed. And Welfare*, 589 F.2d 365, 369 (8th Cir. 1978) (one-sentence

diagnosis report properly rejected where it was not corroborated by "clinical or laboratory findings" and "the basis for the diagnosis [was] not revealed.").

Here, Scott wants to take a myopic approach to the record and rely solely on her own testimony and a handful of conclusory records between April and June 2018 indicating, in the most generic manner possible, that she suffers "spinal stenosis," "radiculopathy," "low[er] back pain," and "myelopathy." (Tr. 509-518). None speak directly to the intensity of such symptoms or functional limitations that result therefrom. Scott points out that she has a hard time doing daily activities and continues to have "numbness on both [] arms," but that does not indicate a disability in itself. (Tr. 36-37, 219-226). The ALJ can, and in this case did, reject Scott's subjective complaints of disability by pointing to contrary evidence in the total record—evidence that included conservative post-operative treatment, unremarkable objective testing, a retained ability to perform a number of daily activities, and several normal or near-normal examinations. *See Swink v. Saul*, 931 F.3d 765, 771 (8th Cir. 2019); *Twyford v. Commissioner, Soc. Sec. Admin.*, 929 F.3d 512, 518 (8th Cir. 2019); *Jenkins v. Chater*, 76 F.3d 231, 232-233 (8th Cir. 1996);

### C. The ALJ Did Not Err In the Weight That Was Afforded to A Non-Treating Medical Provider

The ALJ afforded "considerable weight" to the opinions of Dr. Renu Debroy, a non-examining state agency medical consultant, because they were "generally consistent with the medical record of evidence as a whole," particularly regarding "claimant's pattern of treatment, diagnostic imaging, and objective testing." (Tr. 20). Among other

things, Debroy concluded that Scott should be 'limited to only 10 lbs lifting/carrying due to some weakness/tingling in bilateral hands." (Tr. 65). In addition, Debroy suggested Scott should only "occasionally balance, as she has had a couple documented cases where she fell," she should also "never climb ladders/ropes/scaffolds … [in case] she [has] an unsteady episode and fell." (Tr. 64). In nearly two full pages, Debroy then chronicles Scott's treatment through the date of his opinion. (Tr. 65-67).

Scott says the ALJ erred in giving considerable weight to Debroy because Debroy "did not cite any specific facts which would support his conclusion as to [Scott's] abilities." According to Scott, "Debroy's cryptic answers concerning [her] would not be accepted by a reasonable mind as the basis of a decision."

Several things are wrong with this argument. First, as a practical matter, the ALJ made clear that Debroy's opinions were not given controlling weight; so, it is clear the ALJ did not adopt Debroy's conclusions wholesale as the "basis of [her] decision." Any argument to the contrary is disingenuous. Second,  the ALJ explained the weight she assigned to Debroy—as she was required to do under 20 C.F.R. § 404.1527(e)(2)(ii)—by saying she adopted it to the extent it comported with the total record, including "the claimant's pattern of treatment, diagnostic imaging, and objective testing." *See Willcockson v. Astrue*, 540 F.3d 878, 880 (8th Cir. 2008) (in explaining the weight given to a consultative opinion, the ALJ must evaluate the "degree to which the opinions … consider all of the pertinent evidence"). Thus, Debroy's opinions were a buttressing factor to the ALJ's RFC decision otherwise based, correctly so, on the total record. *See Hensley*, 829 F.3d at 932 (an RFC is determined from "all of the relevant evidence," not

16

"by a specific medical opinion"). That record shows, for example, that Scott can still manipulate objects with her hands, albeit with difficulty—a gallon of milk or a handful of laundry being two examples provided by Scott. (Tr. 224). It is, thus, not outside of reason for Debroy to conclude Scott cannot lift more than 10 pounds due to "some weakness" in the hands. (Tr. 65). In fact, Debroy chose this 10-pound limitations on the basis of other doctors suggesting Scott should lift no more than 10 pounds. (Tr. 65-66, 329). Further, Debroy's concerns about Scott's "unsteady episodes" and tendency to fall were directly in line with Scott, herself, suggesting she was afraid to do many things because she is concerned about falling. (Tr. 64, 220, 223). Simply put, Debroy's opinions "as to [Scott]'s abilities" were not pulled from thin air and there is nothing "cryptic" about them. Debroy was careful to pull from the available record in making functional determinations.

Regulations make clear that, in "explaining … the weight given to the opinions of a state agency medical [] consultant," the ALJ will consider factors such as the "supportability" and "consistency" of a medical opinion. 20 C.F.R. § 404.1527(c), (e)(2)(ii). The ALJ found Debroy's opinions both supported by and consistent with the total record and gave "considerably weight" to those opinions as such. No error was committed in that respect. *Twyford*, 929 F.3d at 518 (ALJ did not err in giving "significant weight" to consultative opinions that were "consistent with the evidence" as a whole).

## VI. Conclusion

This Court's review is limited to determining whether the ALJ's findings are based on correct legal standards and supported by substantial evidence. It does not substitute its own judgment for that of the ALJ. *Gann v. Berryhill*, 864 F.3d 947, 950 (8th Cir. 2017). Having found the ALJ's conclusions were supported by substantial evidence and that legal standards were correctly applied, this Court affirms the ALJ's decision.

Accordingly,

**IT IS HEREBY ORDERED** that the Commissioner's decision is **AFFIRMED** and plaintiff Bridgette Scott's complaint (ECF #1) is **DISMISSED with prejudice**. A separate judgment accompanies this Order.

So ordered this 29th day of June 2020.

                                                  STEPHEN N. LIMBAUGH, JR.
                                                  UNITED STATES DISTRICT JUDGE